Vincent P. Slusher
State Bar No. 00785480
vince.slusher@dlapiper.com
J. Seth Moore
State Bar No. 24027522
seth.moore@dlapiper.com
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone:   (214) 743-4572
Facsimile:   (972) 813-6267

COUNSEL FOR DEBTOR AND
DEBTOR-IN POSSESSION

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **In Re:** | § | **Chapter No.:  11** |
| | § | |
| **Angaraka Limited Partnership** | § | **Case No.:  10-33868-sgj11** |
| | § | |
| **Debtor.** | § | |

**DEBTOR'S OBJECTION TO C-III ASSET MANAGEMENT LLC'S MOTION FOR**
**RELIEF FROM AUTOMATIC STAY**

The above-captioned debtor and debtor in possession ("Angaraka" or "Debtor") files this

objection (the "Objection") to the Motion of C-III Asset Management LLC ("C-III" or

"Movant") requesting relief from the automatic stay, dated August 31, 2010 [Docket No. 59] (the

"Motion").  In support of the Objection, the Debtor respectfully states as follows:

**BACKGROUND**

1.       On May 31, 2010 (the "Petition Date"), the Debtor commenced this case by filing

a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.       The Debtor has continued in the possession of its property and has continued to

operate and manage its business as a debtor in possession pursuant to Bankruptcy Code §§ 1107

and 1108.

3.    No trustee, examiner or committee of creditors has been appointed in this case.

4.    In November 2005, the Debtor, a Texas limited partnership, acquired and assumed indebtedness secured by, among other things, a Deed of Trust on four, Class B/C, garden-apartment properties (the "Properties") located in the Dallas/Fort-Worth Metroplex. The Properties -- Woodchase, Clarendon, Keller Oaks, and Sycamore Hills -- total 750 units and range in date of construction from 1979 to 1983. Illustrated below is a summary of each Property's key characteristics:

|  | Sycamore Hill | Keller Oaks | Clarendon | Woodchase |
|---|---|---|---|---|
| Location | Fort Worth, TX | Carrollton, TX | Irving, TX | Irving, TX |
| Number Of Units | 264 | 220 | 192 | 74 |
| Year of Construction | 1983 | 1979 | 1981 | 1983 |
| Current Occupancy | 95% | 88% | 74% | 94% |

5.    When the debtor acquired the Properties, they were encumbered with a loan in the original amount of $20,350,000. As of January 11, 2010 the loan balance totaled $17,690,484. Illustrated below is a Property by Property break down of the loan structure[1]:

|  | Sycamore Hill | Keller Oaks | Clarendon | Woodchase |
|---|---|---|---|---|
| Original Loan Amount | $6,210,476 | $7,167,501 | $4,561,137 | $2,410,887 |
| Amortization | 360 / Balloon | 360 / Balloon | 360 / Balloon | 360 / Balloon |
| Current Interest Rate[2] | 8.90% | 8.90% | 8.90% | 8.90% |
| Maturity | 11/01/2028 | 11/01/2028 | 11/01/2028 | 11/01/2028 |
| Current Loan Balance | $5,265,059 | $6,076,397 | $3,866,799 | $2,043,879 |

6.    In or around January of 2009, Buchanan Street Partners took over as Asset Manager for all of the Properties and employed Pacific West Property Management ("PWM") to serve as "on-site" Property Manager at each Property. Upon engagement, PWM completed an

---

[1] The allocations made hereunder are for illustrative purposes only and the Secured Creditor (defined herein) may not necessarily agree with the allocations or that the loan documents that define the relationship between the Debtor and the Secured Creditor require a release of the Secured Creditor's lien on any one property in return for payment of the amount listed by the Debtor in this chart.
[2] The Anticipated Repayment Date ("ARD") became effective November 1, 2008, triggering a 200 bps increase

in-depth review of each Property. In the course of their review of the Properties, PWM discovered several problems with the Properties, including aesthetic and structural elements that had dilapidated to the point of failing to satisfy required building codes, and a lack of any rentable units due to delayed repairs or general neglect. Since January 2009, Debtor, along with their new property manager PWM, have sought to upgrade the Properties, focusing on the most pertinent items that required attention based on PWM's findings, particularly those mandatory to satisfy city code compliance issues and cure the life-safety items, as well as rehab the assets to be in revenue-generating condition.

7.      At the same time, PWM also identified and sought to remedy several issues with the business management of the Properties. Specifically, PWM discovered that there was limited, if any, monitoring of account payables, the on-site management/support staff was poorly trained and required replacement, there were excessive and often unwarranted concessions being given to new tenants, and there was little to no marketing or advertising materials or activity promoting the Properties.

8.      During 2009, the Debtor, with the help of PWM, had made significant progress with regards to completing some of the much needed repairs, renovations, and management reorganization of the Properties. Many of the completed repairs and renovations were required in order to satisfy city code compliance requirements and to meet basic standards of aesthetics. The Properties further risked being condemned by the city and becoming less marketable in attracting new tenants and retaining existing ones, and thus the need to complete them quickly was imperative. However the drain on cash-flow that such efforts had required compounded the Debtor's hardship in meeting its debt service requirements. Moreover, the market for older multifamily rental units, such as the Properties, in the areas in which the Properties are located

_____

from 6.90% to 8.90% in the loan's effective interest rate.

saw a significant decline in 2009 as new units were built, exacerbating the Debtor's financial situation as tenants were more difficult to come by.

9.      The costs of the repairs and renovations, the economic conditions, and the required debt service payments in 2009 had a significant impact on the Debtor's net operating income.  Due to the increased financial burden of the Debtor brought upon it by the necessary repairs and management changes, and the negative economic conditions, the Debtor began defaulting on its secured debt obligations.  Despite Debtor's best efforts to renegotiate its obligations with its secured creditor, C-III,[3] Debtor was unable to reach terms with C-III that would allow it to operate as a profitable enterprise.  Debtor therefore had no other option than to file for bankruptcy protection on the Petition Date.

10.     On August 31, 2010, C-III filed the Motion, in which it seeks an order lifting the automatic stay, presumably so that C-III may foreclose on the Properties.  The Motion asserts that cause exists to lift the stay under section 362 of the Bankruptcy Code because C-III is undersecured, and because the Debtor is not making interest payments and has no equity in the Properties.  The Motion should be denied.  First, the Bankruptcy Code does not require that the Debtor pay interest on its secured debt obligations to Movant.  Second, C-III has not shown that the Properties are declining in value, and in fact, the Debtor is making improvements to the Properties in accordance with the agreed cash colleral order entered in the case, thereby presumably increasing the value of the Properties.  C-III has not presented any reliable evidence as to the value of the Properties as of the Petition Date in support of its assertion that the Debtor

---

[3] The Debtor's Secured Creditor is Bank of America, National Association, successor to Norwest Bank Minnesota, National Association, as Trustee and REMIC Administrator for the Registered Certificate holders of DLJ Commercial Mortgage Corp, Commercial Mortgage Pass-Through Certificates, Series 1999-CGI, acting by and through C-III Asset Management LLC (f/k/a Centerline Servicing LLC, which was f/k/a Centerline Servicing Inc., which was f/k/a ARCap Servicing, Inc., in its capacity as special servicer pursuant to that certain Pooling and Servicing Agreement dated March 1, 1999) (or "C-III Asset Management")

lacks equity in the Properties. Third, the Debtor will soon file its proposed plan of reorganization and will seek confirmation of that plan as quickly as possible. The Properties are an intricate and necessary part of the Debtor's reorganization efforts. Finally, C-III is, and will continue to be, adequately protected because the Debtor is using income generated from the Properties to improve them, thus increasing C-III's collateral value and Debtor is making adequate protection payments to C-III. The first adequate protection payment to C-III was in excess of $116,000, which was the excess cash generated by the Properties in July. Therefore, the Court should deny the Motion and not lift the automatic stay.

**OBJECTION**

A.    The Court Should Deny The Motion Because C-III Bases Its Arguments On Legally Inconsistent Assertions

11.    As an initial matter, it should be pointed out that C-III makes two assertions in the Motion which are legally inconsistent under relevant bankruptcy law. Specifically, C-III first asserts that it is "currently undersecured" by approximately $24,172.83. (Motion at ¶¶ 10, 14). In the same breath, however, C-III asserts that it is entitled to postpetition interest on its secured loan to the Debtor.[4] However, postpetition interest on secured claims accrues only in accordance with Bankruptcy Code §506(b), which provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, *is greater than the amount of such claim*, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C.A. § 506(b)(emphasis added). Therefore, interest only accrues when the collateral is worth more than the underlying debt obligation. C-III cannot assert that it lacks adequate protection because it is undersecured and at the same time assert that it is not adequately

---

[4] "Furthermore, the amount owed to C-III Asset Management will increase as the case progresses because the

protected because the Debtor is falling further into debt to C-III due to not making post petition interest payments.[5]

B. **C-III Has Failed to Establish The Elements Of Section 362 Required To Lift The Automatic Stay**

12. In addition to its legally contradictory assertions, C-III has failed to establish the statutory requirements for lifting the broad, protective scope of the automatic stay created by section 362 of the Bankruptcy Code. Bankruptcy Code section 362(a)(1) sets forth the scope of the automatic stay, stating in relevant part as follows:

> (a)Except as provided in subsection (b) of this section, a petition filed under section 301, 302 or 303 of this title . . . operates as a stay, applicable to all entities, of—
> (1)the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1). The legislative history of section 362 indicates that Congress intended that the scope of the automatic stay be sweeping in order to effectuate its protective purposes on behalf of both debtors and creditors:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 49 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5840-41, 5963.[6]

---

Debtor's interest payments are three times to four times its projected cash flow…." Motion at ¶14.
[5] Notably, a creditor such as C-III is not entitled to interest payments as a form of adequate protection. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd*., 484 U.S. 365, 382 (1988) ("The Fifth Circuit correctly held that the undersecured petitioner is not entitled to interest on its collateral during the stay to assure adequate protection under 11 U.S.C. § 362(d)(1).").
[6] *See A.H. Robins Co. v. Piccinin (In Re A.H. Robins Co.)*, 788 F.2d 994, 998 (4th Cir.), *cert. denied,* 479 U.S. 876

13. The automatic stay affords a debtor fundamental protections under the bankruptcy laws. *See* H.R. Rep. No. 95-595, at 340 (1977); *Midlantic Nat'l Bank v. N.J. Dept. of Envt'l Protection*, 474 U.S. 494, 503 (1984); *see also In re Drexel Burnham Lambert Group Inc.*, 113 B.R. 830, 836-37 (Bankr. S.D.N.Y. 1990) (stating that the "automatic stay is key to the collective and preservative nature of a bankruptcy proceeding"). It is designed, *inter alia*, to give the debtor a "breathing spell" after the commencement of a chapter 11 case, shielding debtors from creditor harassment and a multitude of litigation in a variety of forums at a time when the debtor's personnel should be focusing on restructuring. *See, e.g., S.I. Acquisition, Inc. v. Eastway Delivery Service, Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1146 (5th Cir. 1987) (stating that the automatic stay "imposes a moratorium on all actions against the debtor or its property and assets" and thereby "ensures a respite for the debtor so that it may attempt to reorganize or decide to liquidate and promotes the overriding policy of equal distribution of a debtor's assets among creditors"); *Taylor v. Slick*, 178 F.3d 698, 702 (3d Cir. 1999).

14. It is against this strong policy in favor of maintaining the automatic stay in effect, whereby "even the slightest interference with the administration [of the Debtors' estates] may be enough to preclude relief," *In re U.S. Brass Corp.*, 173 B.R. 1000, 1006 (Bankr. E.D. Tex. 1994), that a party seeking to lift the automatic stay must establish the requirements set forth in section 362(d) of the Bankruptcy Code, which reads as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-- (1) for cause, including the lack of adequate protection of an interest in property of such party in

---

(1986) (stating that the automatic stay is intended "to protect the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization for the debtor"); *see also Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 503, *reh'g denied*, 475 U.S. 1090 (1986) (the automatic stay is "one of the most fundamental protections provided [to the debtor] by the bankruptcy laws").

interest;
(2) with respect to a stay of an act against property under subsection (a) of this section, if--
(A) the debtor does not have an equity in such property; and
(B) such property is not necessary to an effective reorganization;

11 U.S.C. § 362(d).

*(i)     C-III is Adequately Protected, And Thus No Cause Exists For Lifting The Automatic Stay*

15.     C-III has failed to establish a lack of adequate protection as cause for lifting the automatic stay.  The party seeking to lift or modify the automatic stay bears the initial burden to show a legally sufficient basis, or "cause," for such relief.  *See Mooney v. Gill*, 310 B.R. 543, 547 (N.D. Tex. 2002).  "If the movant fails to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection."  *See Sonnax Industries v. Tri Component Products Corp. (In re Sonnax Industries)*, 907 F.2d 1280, 1285 (2d Cir. 1990); *Mooney v. Gill*, 310 B.R. 543, 547 (N.D. Tex. 2002); *In re Gramercy Court, Ltd.*, 2007 WL 2126493, at *5 (Bankr. S.D. Tex. July 19, 2007); *In re Self*, 239 B.R. 877, 880 (Bankr. E.D. Tex. 1999).

16.     In the motion, C-III asserts that the only cause under section 362(d)(1) of the Bankruptcy Code for lifting the automatic stay is that "C-III Asset Management's interest in the [Properties] is not adequately protected."  (Motion at ¶14).  As discussed above, C-III bases this assertion on its allegation that it is undersecured, and that that the Debtor is unable to make post petition interest payments on its debt obligations to C-III and is thus falling even further into debt to C-III.  As explained above, these two allegations are legally inconsistent, and cannot both form a basis for the relief requested.  Moreover, neither of them have to do with adequate protection under the Bankruptcy Code.

17.     Adequate protection is governed by section 361 of the Bankruptcy Code.  This section requires a Debtor to make payments to a creditor when the automatic stay causes a

decrease in the collateral, to grant a creditor replacement liens when collateral is used, sold, or leased, or by granting a creditor the indubitable equivalent of its secured claim. 11 U.S.C. § 361. In summary it requires that the creditor's collateral value must be protected from a decrease in value caused by the imposition of the bankruptcy case. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 372 (1988). For example, a creditor may be entitled to payments for the depreciation of its collateral. *Id*. at 370. Therefore, C-III's assertion that the Debtor's alleged inability to make postpetition interest payments or that, as of the Petition Date, the balance of C-III's claim was more than the value of the Properties has nothing to do with adequate protection, or the lack thereof, as neither of these concepts reflect any decrease in the value of C-III's collateral post-petition. Being undersecured is not a basis for lifting the stay outlined in section 362. Moreover, interest payments are not required to assure that an undersecured creditor is adequately protected. *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd*., 484 U.S. 365, 382 (1988) ("The Fifth Circuit correctly held that the undersecured petitioner is not entitled to interest on its collateral during the stay to assure adequate protection under 11 U.S.C. § 362(d)(1)."). In sum, not only are these assertions contradictory, they are irrelevant to the issue of adequate protection.

18.     C-III also asserts that the Properties are dilapidated and "rapidly" declining in value. In support of this, C-III cites statements by the Debtor in its pleadings and during the Section 341 Meeting that numerous repairs are needed on the Properties. However, C-III does not account for the fact that these repairs were needed *pre-petition* and are being made post-petition. Moreover, nothing in the Motion, or in the statements or pleadings of the Debtors indicates that day-to-day maintenance of the properties is not ongoing. On the contrary, the agreed cash collateral order provided for funds specifically earmarked for the upkeep of the

Properties, and to make the necessary repairs. The Debtor is using the income generated by the properties, in accordance with the agreed cash collateral order, to maintain the properties, as well as complete certain necessary repairs to the Properties, and this provides adequate protection to C-III.

19.     Debtor has made, and will continue to make adequate protection payments to C-III. The Debtor estimated that these payments would be between $45,161 and $67,789 through December 2010. However, the Debtor has significantly outperformed those projections so far, and the adequate protection payment for July exceeded $116,000. These payments, coupled with the improvements and repairs being made to the Properties are sufficient adequate protection of C-III's interest.

20.     C-III has failed to establish that it lacks adequate protection. Therefore, C-III's request that the Court lift the automatic stay pursuant to section 362(d)(1) should be denied.

*(ii)     C-III Has Failed to Show That Debtor Lacks Equity In The Properties Or That The Properties Are Not Necessary For Reorganization*

21.     C-III has failed to show that both the conditions required in §362(d)(2) are present in this case, and thus the Motion must be denied. In order to lift the automatic stay against property pursuant to §362(d)(2), a court must determine that "(A) the debtor does not have equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. §362(d)(2).

22.     First, C-III has failed to meet its burden that the Debtor lacks equity in the Properties. A creditor seeking to lift the automatic stay pursuant to section 362(d)(2) has the burden to establish that the debtor has no equity in the secured property. 11 U.S.C. 362(g)(1). In an effort to establish the values of the Properties, C-III, with the Motion, submitted various

appraisals.[7] However, the appraisals submitted by C-III date back to February 2010 – almost four months prior to the Petition Date. C-III has failed to consider any repairs or improvements the Debtor has made subsequent to the appraisals, and has failed to consider any changes in market conditions or occupancy rates subsequent to the appraisals. Without a more recent appraisal of the Properties, and consideration of these other factors, it is impossible to determine the extent of the Debtor's equity interest in the Properties. In summary, the appraisals are too remote in time to establish the Petition Date value of the Properties, and therefore cannot be determinative as to the equity interest of the Debtor in the Properties.

23.     Second, the Properties are the Debtor's primary assets, and are clearly necessary for any reorganization. The Properties are going concerns and generate income. The Debtor plans on using the income generated by the Properties to reorganize, pay its creditors, and continue repairing the Properties for their eventual sale. Such reorganization would be in the best interest of all creditors, whereas a foreclosure would benefit only C-III. *See A.H. Robins Co. v. Piccinin (In Re A.H. Robins Co.)*, 788 F.2d 994, 998 (4th Cir.), *cert. denied,* 479 U.S. 876 (1986) (stating that the automatic stay is intended "to preclude one creditor from pursuing a remedy to the disadvantage of other creditors"). As the Properties are clearly necessary for a successful reorganization, the requirements section 362(d)(2)(B) are not satisfied and the Court therefore should not lift the automatic stay.

## CONCLUSION

The Motion should be denied, as C-III has failed to establish the elements of section 362 of the Bankruptcy Code required to lift the automatic stay. Specifically, C-III has failed to show that it is not adequately protected, and its references to interest payments and being undersecured are legally inconsistent and irrelevant to its argument. Moreover, C-III has failed to establish

---

[7] The appraisals are attached to the Motion as Exhibit Nos. 6-9.

that the Debtor lacks equity in the Properties. Finally, the Properties are vital to the successful

reorganization of the Debtor, which reorganization would be in the best interest of all creditors.

Therefore, the Court should deny the Motion and not lift the automatic stay.

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that this

Court deny C-III's Motion seeking relief from the automatic stay, and grant the Debtor such

other relief as is just and proper.

Dated: September 14, 2010
Dallas, Texas

**DLA PIPER LLP (US)**

By: /s/ *J. Seth Moore*
Vincent P. Slusher
State Bar No. 00785480
vincent.slusher@dlapiper.com
J. Seth Moore
State Bar No. 24027522
seth.moore@dlapiper.com

DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 743-4572
Facsimile: (972) 813-6267

Counsel for the Debtor
and Debtor in Possession

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served on September 14, 2010 to (i) the Office of the United States Trustee; (ii) the Debtor's twenty largest unsecured creditors; and (iii) the Debtor's secured creditor by United States mail and/or ECF notification.

/s/ *J. Seth Moore*
J. Seth Moore