Clay M. Taylor
Texas Bar I. D. 24033261
C. Josh Osborne
Texas Bar I. D. 24065856
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone:    817/332-2500
Telecopy:     817/878-9280

*Counsel for C-III Asset Management LLC*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 10-33868-11 |
| ANGARAKA LIMITED PARTNERSHIP | § | |
| | § | |
| DEBTOR. | § | CHAPTER 11 |

## C-III ASSET MANAGEMENT'S SECOND EMERGENCY MOTION TO CONFIRM TERMINATION OF AUTOMATIC STAY

C-III Asset Management LLC (f/k/a Centerline Servicing LLC, f/k/a ARCap Servicing, Inc.), in its capacity as special servicer pursuant to that certain Pooling and Servicing Agreement dated March 1, 1999 ("C-III Asset Management"), files its Second Emergency Motion to Confirm Termination of Automatic Stay (the "Motion"). In support of the Motion, C-III Asset Management shows the following:

1. On May 31, 2010, Angaraka Limited Partnership ("Debtor") filed for relief under Chapter 11 of the Bankruptcy Code. Since that time, Debtor has continued to operate its business as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

2. On June 14, 2010, Debtor filed its Motion for Interim and Final Orders Authorizing Use of Cash Collateral and Granting Related Relief (the "Cash Collateral Motion") [Docket No. 16]. An agreed final cash collateral order was entered granting the Cash Collateral Motion on July 6, 2010 (the "Agreed Order") [Docket No. 46].

3. The Agreed Order provides that Debtor's authorization to use cash collateral will terminate upon "any violation or breach of any term of the Agreed Order by Debtor that is not cured within five (5) business days of receipt by Debtor and Debtor's counsel, of notice of such default, violation or breach (except that in the third instance of default the automatic stay shall automatically terminate)." Agreed Order, ¶ 10.

## PRIOR DEFAULTS

4. Since the Agreed Order was entered, Debtor defaulted on numerous occasions and only cured these defaults several days to several weeks after it was notified of the default.

5. Over the first several months, C-III Asset Management negotiated the cure of Debtor's serial defaults without seeking assistance from the Bankruptcy Court. However, after nearly a year of notifying Debtor that it had defaulted and waiting for it to finally cure these defaults, C-III Asset Management determined that enough was enough.

6. Thus, on April 15, 2011, C-III Asset Management filed its Emergency Motion to Confirm Termination of Automatic Stay against Debtor (the "First Motion") [Docket No. 116] seeking confirmation that the stay had terminated due to Debtor defaulting on its payment, reporting and insurance maintenance obligations.

7. At a hearing on the First Motion, the Court acknowledged the defaults, and gave Debtor until 5:00 p.m. the next business day to cure those defaults or the automatic stay would terminate.

8. Debtor cured the defaults identified in the First Motion, but defaulted the very next month by: i) failing to pay its April net cash flow over to C-III Asset Management; and ii) not sending C-III Asset Management the April lender reports or net cash flow required under the Agreed Order on a timely basis (collectively, the "May Defaults").

9. On May 21, 2001, C-III Asset Management filed a notice that the stay had terminated due to the May Defaults [Docket No. 135]. C-III Asset Management withdrew that notice [Docket No. 138] upon Debtor agreeing that net cash flow and the required reporting be turned over to C-III Asset Management by the 20th day after month end.

### CURRENT DEFAULT

10. C-III Asset Management now files this Motion, seeking confirmation that the stay has terminated due to Debtor's most recent default.

11. Under the terms of the Agreed Order, Debtor was required to "escrow in dedicated DIP accounts the budgeted amounts required to pay for insurance and real and personal property taxes." Agreed Order, ¶ 12(e). Debtor, however, has grossly underfunded its real and personal property DIP tax escrow account (the "Tax Escrow"). Specifically, Debtor's 2011 Budgets for each of Debtor's properties (collectively, the "Budgets") provide that Debtor will place $205,547.00 in the aggregate, into the Tax Escrow for the period January-April 2011. *See* Budgets, pg. 3 under the heading "Property Taxes and Insurance," subheading "Property Taxes." Copies of the Budgets are attached to the Motion as **Exhibits A-D**. Yet, when C-III Asset Management reviewed Debtor's April Monthly Operating Report, filed on May 20, 2011 [Docket No. 133], it discovered that the Escrow Account held only $40,095.19—a deficiency of over $165,000.

12. Upon learning of this apparent deficiency, counsel for C-III Asset Management prepared a detailed chart (the "Tax Escrow Chart"), identifying what amounts should have been contributed to the Tax Escrow compared to the actual balance. A copy of the Tax Escrow Chart is attached as **Exhibit E**. C-III analyzed this data two ways. First, it determined what amount should be in the Tax Escrow if Debtor had not paid more than the funds it had in the Tax Escrow for 2010 (as it was instructed to do by C-III Asset Management). After analyzing the data this

way, C-III Asset Management surmised that Debtor had underfunded its Tax Escrow by over $165,000. Second, C-III Asset Management applied the tax payments actually made by Debtor in order to identify what amount should be in the Tax Escrow when viewed in the light most favorable to Debtor. Using this methodology, C-III Asset Management discovered that the Tax Escrow was still underfunded by $21,610.91 as of April 30, 2011.

13. Perhaps more importantly, when C-III Asset Management compared the Tax Escrow balance at the end of March to the end of April, C-III Asset Management learned that, instead of increasing by $49,817.00, the Tax Escrow actually *decreased by $79,229.53 despite no tax payments being made in April.* Since no tax payment was made in April, it is inappropriate to use the $21,610.91 number identified in ¶ 12. Instead, the lowest amount that should have been in the Tax Escrow as of April 30, 2010 is $169,141.72, meaning that the Tax Escrow is underfunded by at least $120,000.[1]

14. It appears funds were taken out of the Tax Escrow in April so that Debtor could cure the defaults identified in the First Motion.

15. After analyzing the data in the Tax Escrow Chart and numerous prior calls and e-mail to Debtors' counsel about the apparent default, counsel for C-III Asset Management sent an emails to Debtor's counsel, notifying Debtor that it was in default under the terms of the Agreed Order and the questionable manner in which the Tax Escrow was being used. It also offered various terms to allow Debtor to cure the default, including putting $160,000 into the Tax Escrow. Debtor's counsel indicated that there were not funds available to replenish the Tax Escrow, but that Debtor was willing to amend the Budgets to replenish the Tax Escrow. Since amending the Budgets going forward would likely have a significant adverse impact on the value

---

[1] The lowest Tax Escrow balance as of April 30, 2011 was calculated as follows: Tax Escrow balance as of end of March ($119,324.72) + required April Tax Escrow payment pursuant to the Budgets ($49,817.00).

of C-III Asset Management's collateral, it declined to amend the Budget. A copy of the Default Notice and related correspondence are attached as **Exhibit F**. Instead, C-III Asset Management requests that the Court enforce the terms of the Agreed Order and enter an order confirming that the automatic stay is terminated due to Debtor's failure to properly fund its Tax Escrow and allow it to immediately exercise its rights under state or other applicable law.

## REQUEST FOR RELIEF

C-III Asset Management requests that the Court: (i) enter an Order confirming the termination of the automatic stay; (ii) to the extent Fed. R. Bankr. P. 4001(a)(3) applies, waive the 14 day stay of that relief; and (iii) grant such other and further relief to which C-III Asset Management may be entitled.

Respectfully submitted,

/s/ *Clay M. Taylor*
Clay M. Taylor
Texas Bar I. D. 24033261
clay.taylor@kellyhart.com
C. Josh Osborne
Texas Bar I. D. 24065856
c.joshosborne@kellyhart.com
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone: 817/332-2500
Telecopy: 817/878-9280

*Counsel for C-III Asset Management LLC*

## CERTIFICATE OF CONFERENCE

I hereby certify that beginning on June 1, 2011, Debtor's counsel and I had a series of telephone conferences and email exchanges. Debtor opposes the relief sought in this Motion.

/s/ Clay M. Taylor
Clay M. Taylor

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing document was served on June 10, 2011 upon the counsel for Debtor, the Office of the United States Trustee, Debtor's 20 largest creditors, and all persons who have filed a notice of appearance and request for service of pleadings in the chapter 11 case via first class, U.S. mail, postage prepaid, e-mail, or via ECF Electronic Notice.

/s/ C. Josh Osborne
C. Josh Osborne

# ANGARAKA LIMITED PARTNERSHIP
# SERVICE LIST

U.S. Trustee
1100 Commerce Street
Room 976
Dallas, TX 75242-1496

Angaraka Limited Partnership
Buchanan Street Partners
620 Newport Center Drive, 8th Floor
Newport Beach, CA 92660

J. Seth Moore
DLA Piper LLP (US)
1717 Main Street, Suite 4600
Dallas, TX 75201

Vincent P. Slusher
DLA Piper LLP US
1717 Main Street
Suite 4600
Dallas, TX 75201

J National Contractors, Inc.
17630 Davenport Road Ste 104
Dallas, TX 75252

Alejandro Cabrera
P.O. Box 382608
Duncanville, TX 75138

Painting by Olda, Inc.
5614 Sachse Street
Sachse, TX 75048

Javier Ramirez
2811 Cumberland Dr.
Mesquite, TX 75150-3805

HD Supply Facilities Maintenance
PO Box 509058
San Diego, CA 92150-0958

Enrique Hernandez
Hernandez Repair
1723 Peters Rd Ste 442
Irving, TX 75061-3238

All-Star Flooring, Inc.
3241 Garden Brook Drive
Farmers Branch, TX 75234

Woodland Graphic Custom Signs
P.O. Box 822702
Dallas, TX 75382

Sunbelt Pools, Inc.
10555 Plano Road
Dallas, TX 75238

Startex Power
P O Box 4802
Houston, TX 77210-4802

Wilmar Industries, Inc.
PO Box 404284
Atlanta, GA 30384-4284

Greensheet
2501 Parkview Dr, Suite 430
Fort Worth, TX 76012

Victor Manuel Litteri
403 Rosemary Lane
Euless, TX 76039

Earthworks, Inc.
PO Box 199
Lillian, TX 76061

Ana Gutierrez
P.O. Box 201542
Arlington, TX 76006

Metro Staffing LLC
PO Box 905756
Charlotte, NC 28290-5756

RV All Floors LLC
2734 Copper Valley Ct.
Houston, TX 77067

Vincente Mejia
P.O. Box 451044
Garland, TX 75045

Taurus Painting
PO Box 701002
Dallas, TX 75370-1002

Redi Carpet
PO Box 971442
Dallas TX 75397-1442